Appropriate orders consistent with all the foregoing will be entered.

**James I. BAILEY, Plaintiff,**

v.

**Robert H. FINCH, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 1031.**

United States District Court
W. D. Arkansas,
Texarkana Division.

May 28, 1969.

Charles L. Honey, Prescott, Ark., for plaintiff.

Robert E. Johnson, U. S. Atty., Fort Smith, Ark., for defendant.

## OPINION

### WILLIAMS, District Judge.

#### Statement

This is an action under section 205(g) of the Social Security Act, as amended (42 U.S.C.A. § 405(g)), to review a "final decision" of the Secretary of Health, Education, and Welfare. This section provides, *inter alia*, that "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing" and that "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Section 205(h) of the Act (42 U.S.C.A. § 405(h)) expressly restricts the judicial remedy to the aforesaid manner of judicial review, and contains a prohibition against an action under the general jurisdiction of the Federal district courts for a money judgment.

#### Administrative Proceedings

On December 9, 1965 [1] the plaintiff filed an application for establishment of a period of disability under section 216 (i) of the Act (42 U.S.C.A. § 416(i)) and for entitlement to disability insurance benefits under section 223 of the Act (42 U.S.C.A. § 423) alleging the onset of a disability within the meaning of the Act on May 10, 1954 (Tr. 115–118). The Social Security Administration denied this application on March 17, 1966 (Tr. 120–121) and, upon the plaintiff's request for reconsideration, affirmed its

denial (Tr. 124–125). The plaintiff filed a request for a hearing before a hearing examiner (Tr. 21) and a hearing was conducted on October 4, 1966 (Tr. 23–70). The hearing examiner took testimony and secured documentary evidence relative to the plaintiff's application and on the record so constituted rendered a decision dated November 21, 1966, holding the plaintiff not disabled within the meaning of the Act, either as it read prior to its amendment on July 30, 1965, or as so amended (Tr. 4–15). The plaintiff made request to the Appeals Council of the Social Security Administration for review of the hearing examiner's decision (Tr. 2). Said request was denied on March 14, 1967 (Tr. 1) whereupon the decision of the hearing examiner became the "final decision" of the Secretary subject to judicial review herein.

#### Proceedings in This Court

On April 27, 1967 the claimant in the administrative proceedings filed a complaint requesting a review of the decision of the Secretary of Health, Education, and Welfare, denying his claim pursuant to the right provided by 42 U.S.C.A. section 405(g). This complaint was filed within 60 days after notice to the claimant of the denial of his claim (Tr. 1).

On June 22, 1967 the Secretary of Health, Education, and Welfare filed an answer to the complaint, and on November 29, 1967 he filed motion for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure pursuant to the request of the Court that each party file such motion. The plaintiff filed no such motion nor any response in opposition to the motion of the Secretary of Health, Education, and Wel-

---

1. The plaintiff had previously filed application on July 11, 1955 (Tr. 77–79), September 13, 1960 (Tr. 87–90), October 2, 1962 (Tr. 96–99) and October 7, 1964 (Tr. 103–106). The plaintiff upon initial denial or denial after reconsideration of these applications (Tr. 86, 94–95, 101–102, 113–114) did not exercise his right

to further administrative action and ultimate judicial review within the time allowed by the Social Security Act and the regulations promulgated pursuant thereto, and therefore none of these applications are before the Court for review herein.

fare, but by letter dated January 11, 1968 submitted for the record a letter report of Dr. Harvel Harrison, dated January 10, 1968. Thereupon the Court on the date of February 2, 1968 remanded the cause for the submission of further evidence relating to the plaintiff's mental and emotional condition and also any other evidence.

### Further Administrative Proceedings

Pursuant to the remand order the Appeals Council vacated its action of March 14, 1967 and remanded the case to a hearing examiner for further proceedings consistent with the order of the Court, which hearing was held on May 16, 1968, at which time certain additional documentary evidence was offered for the record and Dr. Stevenson Flanigan testified. The claimant objected to his testimony on the ground that he was not a qualified psychiatrist and refused to continue with the hearing (Tr. 263–275).

On May 24, 1968 the hearing examiner issued a recommended decision (Tr. 214–232). On the same date the claimant and his attorney were notified that any objections to the recommended decision should be filed with the Appeals Council within 20 days (Tr. 213). No objections were made by the claimant or his attorney, nevertheless the Appeals Council reviewed the findings of fact, inferences and conclusions as set forth in the hearing examiner's recommended decision, adopted the same and held that the claimant was not entitled to a period of disability or disability insurance benefits. Its decision to that effect was rendered on August 5, 1968 and the claimant and his attorney were so notified on said date (Tr. 208–210).

### Further Proceedings in This Court

By order of this Court dated the 16th day of July 1968 Wilbur J. Cohen, who

2. Sections 216(i) (1) and 223(c) (2) of the Social Security Act (42 U.S.C.A. §§ 416 (i) (1) and 423(c) (2)) provide in pertinent part:

succeeded John W. Gardner as Secretary of Health, Education, and Welfare, was substituted as a party defendant.

On August 23, 1968 the defendant Wilbur J. Cohen filed a supplemental transcript of the proceedings in connection with the previous remand of this cause. On September 24, 1968 the plaintiff, Bailey, again moved that the case be remanded to the Social Security Administrator for further hearings. By order of this Court, dated December 10, 1968, the motion of the plaintiff, Bailey, to remand the cause was denied. By letter of the same date Bailey's attorney was notified that he should file a motion for summary judgment and brief in support thereof. By order of this Court, dated February 12, 1969, Robert H. Finch, who succeeded Wilbur J. Cohen as Secretary of Health, Education, and Welfare, was substituted as party defendant.

In response to a telephone conversation with Bailey's attorney with respect to the matter of filing a motion for summary judgment together with supporting brief, or at least a brief in opposition to the motion of the defendant for summary judgment, the Court was advised by letter from Bailey's attorney on April 23, 1969, that he did "not feel that it would be advantageous to my client for me to submit further oral arguments or written briefs in this matter." Whereupon the Court proceeded to determine the case upon the entire record.

### Statement of the Issue

The issue for determination is whether there is substantial evidence in the record to support the decision of the Secretary that the plaintiff (having the burden of proof thereof)[2] failed to establish that on or before December 31, 1954:

(1) he was disabled within the meaning of the act as it read prior to its

"An individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required."

amendment by Public Law 89–97, July 30, 1965;

or

(2) he was under a disability within the meaning of the Act as amended by said Public Law 89–97.

The term "disability" was defined (prior to the amendments of July 30, 1965) both in section 216(i) (1) and section 223(c) (2) of the Act as the:

" * * * inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration."

Both section 216(i) (1) and section 223(c) (2) of the Act were amended on July 30, 1965, by sections 303(a) (1) and (2) of Public Law 89–97 so that they now define "disability" as the:

" * * * inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death *or which has lasted or can be expected to last for a continuous period of not less than 12 months.*" (Emphasis added).

Section 303(f) (1) of Public Law 89–97 makes the amended definition applicable in all cases in which notice of the "final decision" of the Secretary had not been given to the applicant prior to July 1965.

It should be noted, however, that said section 303(f) (1) further provides that no monthly insurance benefits under Title II of the Social Security Act shall be payable or increased by reason of the amended definition prior to September 1965.

### Statement of Facts

In his application for disability insurance benefits the plaintiff alleged that he was born on June 7, 1913; that he had completed eight years of formal education, and that he had become disabled on May 10, 1954 as the result of a brain injury and back injury (Tr. 115–118). The plaintiff's earnings record compiled for Social Security purposes (Tr. 127) indicated that he last met the applicable insured status requirement on December 31, 1954.

Dr. John L. Ruff, who was apparently the first doctor to examine and treat the plaintiff after his injury of May 10, 1954, reported on June 30, 1954 that:

"By the first of June this patient had excellent healing of scalp wound and all abrasions. The swelling and discoloration around the right shoulder had disappeared by June 8th and the patient had good range of motion. There was no spasm of lumbar muscles. The patient had made good progress in the hospital and at home throughout the month of May. He worked and did a great deal at home in taking care of his livestock. I believe that this activity was beneficial.

"During June the patient has shown regression in his complaints but has appeared well by all physical findings. Whereas previously he had completely cleared on tenderness in back, he became quite jumpy to very little pressure. He made more subjective complaints about shoulder and back although by observation he seemed OK. He makes one complaint which I believe is probably justified and that is of flashes of pain on the side of the head upon exertion and sudden motion of the head and neck.

"I request that the patient be referred to Dr. Robert Watson, Neuro-surgeon, and to an orthopedic surgeon, for more complete evaluation. An X-ray of back (lateral 6/11/54) was negative for fracture or disc compression. Urinalysis was also negative." (Tr. 144)

Dr. Lonnie R. Turney and Dr. Glenn G. Hairston, both of whom were general practitioners (Tr. 195, 198), submitted reports in which they indicated that the plaintiff had first consulted them during June 1954, with complaints of pain in the thoracic (chest) and lumbar (located be-

tween the lower ribs and upper edge of the hipbones) region, loss of memory and occipital (located in the back part of the skull) headaches radiating into his neck (Tr. 152, 157, 158). According to the plaintiff's history as related by Dr. Turney the plaintiff had been injured on May 10, 1954, when a cable on an oil well rig broke and struck him on the head and shoulders, knocking him to the ground in a sitting position. The plaintiff claimed that he was unconscious for some time and was taken to Magnolia, Arkansas, where he was seen by a doctor. In the early part of July 1954 he had complaints of pain in his neck and about his rectum. Dr. Turney further related that on July 16, 1954 the plaintiff was examined by Dr. James W. Shuffield, an orthopedic surgeon, and Dr. John Adametz, a neurological surgeon. Still later in July 1954 the plaintiff complained of having had "falling out" spells and claimed that he had about 5 such spells in June and 4 during July. The plaintiff was again seen at the office of Drs. Turney and Hairston on August 11, 1954. On this occasion the plaintiff claimed that he had become unconscious the previous day while attending a funeral. An X-ray was reported as disclosing a fracture of the 7th thoracic vertebra, and a tentative diagnosis of post traumatic epilepsy was made (Tr. 152).

The plaintiff was hospitalized for observation from August 11, 1954 until August 17, 1954. The plaintiff was kept in bed during this time, and no seizures were noted. He was referred to Dr. Adametz and Dr. Watson to determine whether he had nerve root damage and post-traumatic epilepsy (Tr. 157–158). According to Dr. Turney's report Dr. Watson reported that the plaintiff had recent bony injury to his 7th thoracic vertebral body (Tr. 152). Dr. Turney stated that as of July 19, 1955 the plaintiff:

" * * * has not returned to work and still complains of pain in this thoracic region upon continued exercise. He states that he can do fairly well for a short time but becomes exhausted and develops pain in his back when he persists in exercises for any length of time. He also states that he is unable to sleep in any one position for very long and awakes with a nagging discomfort in the mid-thoracic region. It has been estimated by the orthopedic surgeon that he has a fifteen percent maintained on mild sedation and exercises recommended by the orthopedic disability (permanent). He is being surgeon." (Tr. 152).

Dr. Hairston indicated that the plaintiff was seen by a Dr. M. J. Hollis on November 21, 1955 and that Dr. Hollis had stated that the plaintiff had a psychosis. Dr. Hairston further reported that the plaintiff's healing period had ended by February 16, 1956, but that the plaintiff had been back to his office several times since then complaining of pain in his back, aching in his calves upon prolonged standing, pain in his neck and head, and blacking-out spells (Tr. 157–158).

Dr. Hairston was of the opinion that the plaintiff had a permanent partial disability to his back as a result of the fracture of his 7th thoracic vertebra and contusion of his back equal to 25% disability to the body as a whole and that he had a 50% disability of his body as a whole resulting from epileptic attacks and mental deterioration (Tr. 157–158).

Dr. Joseph D. Calhoun, a radiologist, reported that x-rays taken on July 16, 1954 showed the bones of the plaintiff's skull to be normal. He noted that there was no evidence of intercranial calcification or bone destruction in the plaintiff's skull. X-ray examination of the plaintiff's cervical spine disclosed a normal curvature. The vertebral bodies, intervertebral spaces, and interarticular joints were all normal. X-rays of the plaintiff's dorsal and lumbar spine revealed a normal contour and normal intervertebral spaces. The bone and joint architecture was well preserved and intact. X-rays of the plaintiff's lower sacrum and coccyx revealed that the bony architecture was preserved and intact. The lower tip of the coccyx (tail

bone) was inclined slightly anteriorly, but this was felt to be a developmental anomaly rather than the result of any injury (Tr. 143).

On November 8, 1954 Dr. James W. Shuffield, the orthopedic surgeon who had examined the plaintiff on July 16, 1954, and November 3, 1954 at the request of Drs. Hairston and Turney, reported his findings (Tr. 145–146). He indicated that upon thorough examination of the plaintiff he could find no palpable abnormalities of the chest wall and no definite nerve root pattern of pain. While there was tenderness over the spinous process of D–7, there was no tenderness along the course of the intercostal nerves. There was an area of subjective numbness along the back from D–1 to D–10, covering an area about 4 inches to either side of the mid-line, but this did not follow any particular nerve root distribution. There was no loss of motion in the cervical or lumbar spine. There was no muscle spasm in the plaintiff's neck or back. There were no reflex, sensor or motor changes in the plaintiff's upper or lower extremities. There was mild tenderness in the plaintiff's coccyx. Dr. Shuffield noted that at the time the x-rays were made for his first examination of the plaintiff in July (apparently the x-rays reported by Dr. Calhoun (Tr. 143)) the plaintiff's only complaints were of discomfort in the lumbar and cervical areas of his spine and therefore the middle thoracic area was not x-rayed. Upon review of the x-rays made by Drs. Hairston and Turney, Dr. Shuffield found that the plaintiff did have a definite compression fracture of D–7 (the 7th thoracic vertebra) with 50% compression of the anterior surface of the body of D–7. However, the latest x-rays indicated this fracture to be well healed. Dr. Shuffield concluded that as of November 3, 1954 the plaintiff:

" * * * has now recovered sufficiently to return to fairly heavy work. *I feel that as long as he is allowed to remain off from work, that he will do so.* If he is forced to carry out exercises that I outlined to him his complaints will be minimized and his pain will gradually subside. *He is not eager to carry out the exercises, nor is he eager to return to his work.* He apparently is doing some work around his farm, and that along with his compensation is able to get along fairly well.

"I feel that this man will have some permanent partial disability as a result of the compression fracture of the 7th dorsal vertebra, and this will be approximately 15% of the body as a whole. I feel that this man should be urged to carry out his exercises and get back to regular work, and settle this case as soon as possible. He will continue to have pain for sometime, but this will gradually subside as he increases his activities. I am unable to explain the type of chest pain that he is complaining of, but doubt that this is due to nerve root irritation at the fracture site." (Tr. 146) (Emphasis added).

On January 29, 1955 Dr. Max Baldridge an ophthalmologist resported that he had examined the plaintiff's eyes on January 27, 1955. He indicated that the plaintiff had a small or moderate amount of refractive error, not unusual in individuals in their late 30's or early 40's, which was correctable through the use of eye glasses (Tr. 147).

On March 24, 1955 the plaintiff was again examined by Dr. Shuffield. Dr. Shuffield reported that he was unable to account for the plaintiff's complaints on the basis of his compression fracture, which was well healed. He felt that the plaintiff might have mild pain in his back, especially during cold, damp weather and that as long as the plaintiff did not carry out exercises to keep his back strengthened he would probably have some soreness in his back. In Dr. Shuffield's opinion the plaintiff was fully capable of returning to some type of fairly heavy work, and while he might not immediately be able to carry out heavy lifting he could be gradually worked into it. He felt that the plain-

tiff required no further treatment and that he had at most a 15% permanent partial disability of his body as a whole (Tr. 149–150).

The record does not indicate that the plaintiff was examined by any other physicians until April 19, 1956, over a year after he last met the insured status requirement for disability purposes under the Social Security Act. On April 19, 1956 the plaintiff consulted Dr. C. Lynn Harris, a general practitioner. Dr. Harris reported that the plaintiff had complaints of pain in his back and neck if he attempted to do any work, that he also complained of inability to sleep well at night and constant soreness and tightness in the back of his neck. Upon examination of the plaintiff's head and neck Dr. Harris found some muscular tenseness and tenderness of the posterior cervical muscles at the occipital attachment especially on the left (i. e. the muscles in the rear of the neck adjoining the back of the skull) with some limitation and extension but lateral motion was good. On examination of the plaintiff's eyes, ears, nose and throat, Dr. Harris noted that the plaintiff was edentulous (had his teeth missing) but was otherwise normal. His heart, lungs, and abdomen were normal. He had full motion of his back and extremeties and there were no apparent neurological abnormalities. X-rays revealed the 50% compression fracture of the plaintiff's 7th thoracic vertebra. Dr. Harris was of the opinion that as of May 4, 1956 the plaintiff had a 25% disability, that his fracture had healed, but he should benefit from physical therapy (Tr. 155–156).

On September 13, 1960 Dr. Harris filled out a form on which he indicated that he had next seen the plaintiff in July 1959 (over 3½ years after his insured status for Social Security disability purposes had expired), and had since seen the plaintiff in December 1959, July 1960 and September 1960. As of September 1960 Dr. Harris diagnosed the plaintiff's condition as (1) Epilepsy due to head injury, (2) a compression fracture of 7th thoracic vertebra, and (3)

chronic prostatitis. At that time Dr. Harris was of the opinion that the plaintiff was unable to perform manual labor or drive an automobile and was therefore unable to work (Tr. 162–163). Thereafter Dr. Harris saw the plaintiff on infrequent occasions from 1960 to 1966 and submitted several other reports reiterating his opinion of 1960 as to the plaintiff's condition (Tr. 164–167, 170–176, 184–185).

On May 1, 1956, the plaintiff was examined by Dr. John M. Hundley, an orthopedic surgeon. Dr. Hundley was of the opinion that the plaintiff had a 25% permanent partial disability of the body as a whole (Tr. 153–154). From November 3, 1956, to July 1, 1957, the plaintiff was seen and examined about once every two weeks by Dr. W. Payton Kolb who estimated that the plaintiff had about 30% to 35% disability from the combined effect of his physical and mental impairments (Tr. 168–169).

On October 18, 1956, the plaintiff was examined by Dr. Nicholas T. Hollis, a psychiatrist. Dr. Hollis reported that from the plaintiff's subjective complaints, and the fact that the plaintiff reported his condition was improved by the use of phenobarbital, he felt that the plaintiff was experiencing epileptoid seizures. He noted that the plaintiff was cooperative and friendly during the examination until it was suggested that the plaintiff was improving and should quit worrying about compensation (the plaintiff had a workmen's compensation claim pending as a result of his accident of May 10, 1954 (Tr. 142)) and "put his mind on his business." Thereafter, the plaintiff became rather resistive to further suggestions. In Dr. Hollis's opinion, the plaintiff could obtain considerable improvement from treatment if he were not so preoccupied with getting disability compensation. Dr. Hollis was of the opinion that 25% was a fair estimate of the degree of the plaintiff's impairment (Tr. 160–161).

A report of the plaintiff's examination and treatment at the Veterans' Administration Hospital at Little Rock, Ar-

kansas, was submitted by Dr. Louis A. Cohen, a specialist in neurology and psychiatry. Dr. Cohen reported that:

"This patient is a 47 year old veteran who was admitted to the hospital on 11–20–60 by the Regional Office to determine what disease he might have and how much disability he has. A copy of the entire history accompanies this summary. In short, he was described as a very inadequate personality in the Navy in 1941 and in the Army in 1942 with quick discharges. His civilian life shows the same poor work record, poor social record, poor adaptation in any field. *He has been examined by many Regional Office psychiatrists and neurologists without* demonstrating any disease. He was in the State Hospital in March, 1959 and found to be sane and competent there.

"PHYSICAL EXAMINATION: This man showed no signs of being acutely or chronically ill. He carries a cane in his right hand for some unknown reason because his gait is not distinctive of anything. There are two small scalp scars on top of the head which are well healed, not symptomatic, and should give no trouble. A complete examination of all organs, including heart, lungs, abdomen, viscera, back, limbs reveals no obvious disease. This man showed no muscle spasm, no deformity, no unusual curves, and moves his spine freely in every direction. *He won't move too far, but that is a willful habit and not pathologic.* The extremities reveal no muscle atrophy. No fasiculations. No deformities. No ankyloses. All muscles well developed. No atrophies and the range of motion is not pathologic to any extent. He won't resist passive motion in the fingers or the wrists or the arms or the legs or toes, but this again is voluntary, and there is no pathologic reason for this weakness which he shows in any form or manner. He holds a cane in his right hand and doesn't put as much weight on his right leg when he walks, but I don't know why. All

cranial nerves show no abnormalities. No tremors. No fasiculations. No unusual movements. The fundi are normal. Eye movement normal. Muscle configuration normal in all four limbs. DTR's present in all four limbs and equal. No muscle atrophy. He perceives all the usual sensory stimuli satisfactorily. Normal neurological.

"LABORATORY DATA: VIRL negative. Urinalysis negative. Blood count negative. Chest x-ray: The lungs are clear. The heart is normal in size and configuration. There is a deformity of the right clavical suggesting a previous fracture which has healed. X-ray of cervical spine: There are some mild degenerative changes present but no severe hypertrophic change or subluxation is noted. X-ray of thoracic spine: Anterior wedging of the 7th thoracic vertebral body is again noted without change since February, 1956. An EEG was normal in all respects.

"FINAL SUMMARY page 2

"COURSE IN HOSPITAL: This man was observed for five weeks. During this time he showed no unusual behavior. He had no seizure of any kind. He enjoyed his stay. He ate, walked, played dominoes, checkers, cards, and was always in good spirits. The nurses' notes indicate that he often would lie in bed and say he is sick so that he could get a tray. This was never given, however. Evening nurses always report that he plays cards and is up and around until bedtime. *In short, this man showed no signs of acute disease or chronic disease or episodes of unusual behavior.* The only evidence of disease was shown by the x-ray pictures which showed some mild degenerative changes present, but no severe hypertrophic changes.

"Patient discharged OEC on 12–6–60.

"FINAL DIAGNOSIS: Dg. 1. Observation for neurological and/or psychiatric disease; none found." (Tr. 177–178) (Emphasis Added.)

Reports were also submitted by Dr. Peter L. Edmondson and Dr. Byron

Grimmett, both of whom were of the opinion that the plaintiff was unable to perform heavy manual labor. However, both Dr. Edmondson and Dr. Grimmett had not seen the plaintiff until more than 10 years after his insured status for Social Security disability purposes had expired (Tr. 181–183, 206).

In regard to his vocational experience, the plaintiff testified at the hearing of October 4, 1966, that he spent most of his life on a farm (Tr. 37). He had a grist mill on his farm which he operated until the time of his injury in May 1954 (Tr. 37–38). Additionally, he had been trained and had worked as a carpenter and machinist (Tr. 36–41). He had worked at a munition plant for about a year, starting out at a laboring job as a production operator and eventually being promoted to the job of an inspector (Tr. 39). Thereafter, he worked in an aluminum plant, but left this job to work as a roughneck in the oil field because roughnecking was a better paying job (Tr. 40). He was working as a roughneck at the time of his injury. He claimed that sometime after his injury, he was interviewed for a job at the munition plant but was turned down because of his eyesight (Tr. 43).

In order to be entitled to the establishment of a period of disability and the payment of disability insurance benefits, it was necessary for the plaintiff to establish that he had medically determinable physical or mental impairments of such severity that he was by reason of these impairments left, on or before December 31, 1954 (the last day on which he met the special coverage requirement for disability insurance purposes) without the residual ability to engage in *any* substantial gainful activity. Celebrezze v. Bolas, 316 F.2d 498 (8th Cir. 1963); Seals v. Gardner, 356 F.2d 508 (5th Cir. 1966); Carden v. Gardner, 352 F.2d 51 (6th Cir. 1965); Kartje v. Secretary of Health, Education and Welfare, 359 F.2d 762 (7th Cir. 1966).

The plaintiff alleges that he had become disabled on May 10, 1954 as the result of a brain injury and a back injury.

In regard to the plaintiff's alleged brain injury it should be noted that after five weeks of observation and clinical testing at a Veterans Administration hospital during November and December 1960 no neurological or psychiatric disorder could be found (Tr. 177–178). There were no abnormalities of any cranial nerves, an electroencephalogram was normal in all respects, and the plaintiff perceived all the usual sensory stimuli (sight, hearing, taste, smell, touch, etc.) satisfactorily. During this five weeks of observation the plaintiff was active, walked, played dominos, checkers and cards, was always in good spirits. He had no manifestations of any disease or episodes of any unusual behavior. It was noted that he had prior to this period of observation been examined by many Veterans Administration regional office psychiatrists and neurologists without demonstrating any disease. It was also noted that on occasion the plaintiff would feign illness in order to gain some advantage (Tr. 177–178).

In regard to the plaintiff's alleged back condition, the medical evidence contained in the record indicated that this condition was only partially disabling and would not preclude the plaintiff from engaging in many of the types of employment in which he had experience. Dr. Ruff, the first physician to treat the plaintiff after his accident of May 10, 1954, stated that by June 1954 the plaintiff's injuries appeared to have healed well. He noted that the plaintiff's subjective complaints in regard to his back were excessive in light of the objective findings (Tr. 144). Dr. Shuffield, an orthopedic surgeon noted that while the plaintiff had suffered a compression fracture of his 7th thoracic vertebra, this fracture had healed well. In Dr. Shuffield's opinion the plaintiff had, by November 3, 1954 (about 6 months after his accident) recovered sufficiently to return to fairly heavy work. He estimated the degree of the plaintiff's impairment to be no more than a 15% disability of his body as a whole. Dr. Shuffield felt that the plaintiff's subjective symptoms were influenced by the possibility of obtain-

ing a favorable workmen's compensation settlement (Tr. 146, 149–150).

■ Of the physicians who had examined the plaintiff prior to the expiration of his insured status on December 31, 1954, only Dr. Hairston was of the opinion that the plaintiff was significantly disabled. However, Dr. Hairston's report indicated that his estimation of the plaintiff's disability was based on the plaintiff's subjective symptoms in regard to his back difficulty and on a statement of Dr. Hollis, a psychiatrist, that the plaintiff had a psychosis (Tr. 157–158). Dr. Hollis later reported that in his opinion the plaintiff was only 25% disabled, and that the plaintiff's symptoms were influenced by his preoccupation with obtaining disability compensation (Tr. 160–161). In any event, to the extent that there was a conflict in the medical evidence with regard to the severity of the plaintiff's alleged impairments, such conflict was one for the Secretary to resolve. Celebrezze v. Bolas, supra.

During the course of the hearing the plaintiff also claimed that since the alleged onset of his disability, he had been turned down by a former employer because of faulty eyesight (Tr. 43). However, Dr. Baldridge, an ophthalmologist, reported that the plaintiff had only a small amount of refractive error (i. e. nearsightedness) which was not unusual in individuals of his age, and which was correctable by the use of eye glasses (Tr. 147).

■■ Hence there is substantial medical evidence contained in the record thus far reviewed which would support a conclusion that the plaintiff was at most only partially disabled, and it would serve no useful purpose to make specific reference to further evidence which further substantiates the conclusion of the Secretary of Health, Education, and Welfare denying the claim. It is well established that disability under the Social Security Act means the total inability to engage in any substantial gainful employment.[3] Hicks v. Flemming, 302 F.2d 470 (5th Cir. 1962), cert. den. October 15, 1962, 371 U.S. 868, 83 S.Ct. 132, 9 L.Ed.2d 106; Witherspoon v. Celebrezze, 328 F. 2d 311 (5th Cir. 1964).

■ On December 31, 1954, the date on which the plaintiff last met the in-

---

3. In reporting the disability provisions of the 1954 Amendments to the Social Security Act (P.L. 761, 83d Cong.; 68 Stat. 1052) the Senate Committee on Finance, Sen.Rep. No. 1987, 83d Cong., 2d Sess., pp. 20–21, U.S.Code. Cong. & Admin.News 1954, p. 3710, and the House Committee on Ways and Means, H.R. 1698, 83d Cong., 2d Sess. p. 23, explained the disability standard in Title II of the Act in the following terms:

"*Only those individuals who are totally disabled* by illness, injury, or other physical or mental impairment which can be expected to be of long continued and indefinite duration may qualify for the freeze. The impairment must be medically determinable and preclude the individual from performing *any* substantially gainful work. * * * The physical or mental impairment must be of a nature and degree of severity sufficient to justify its consideration as the cause of failure to obtain any substantially gainful work. Standards for evaluating the severity or disabling conditions * * * will reflect the requirement that *the individual be dis-*

*abled not only for his usual work but also for any type of substantially gainful activity.*" (Emphasis added).

Most recently in reporting the disability provisions of the 1965 Amendments to the Social Security Act (P.L. 89–97, July 30, 1965) the House Committee on Ways and Means, H.R. 213, 89th Cong., 1st Sess., p. 88 reaffirmed its earlier standard for the definition of disability and stated:

"In line with the original views expressed by your committee and since reaffirmed, to be eligible an individual must demonstrate that he is not only unable, by reason of a physical or mental impairment, to perform the type of work he previously did, but that he is unable, taking into account his age, education and experience to perform any type of substantial gainful work, *regardless of whether or not such work is available to him in the locality in which he lives.*" (Emphasis added.)

See also Hayes v. Celebrezze, 349 F.2d 561 (5th Cir. 1965), and Carden v. Gardner, 352 F.2d 51 (6th Cir. 1965).

242

sured status requirement for disability purposes under the Social Security Act, he was only 41 years old. He was experienced in farming and operating a grist mill (Tr. 37–38). He had worked as a carpenter and machinist (Tr. 36–41). He had also worked as an inspector at a munition plant. In light of the extensive medical evidence to the effect that the plaintiff, at that time, still possessed the capacity to engage in most, if not all of his prior occupations and this failure to do so was largely the result of his preoccupation with obtaining compensation for not working, it is clear that the record contains "substantial evidence," at the very least, to support the finding of the Secretary that the plaintiff had failed to establish that he was disabled within the meaning of the Act, either as it read prior to its amendment in 1965 or as so amended, at any time on or before December 31, 1954. The findings of the Secretary are conclusive if supported by substantial evidence, and should be upheld even in those cases where the reviewing court could, had it heard the same evidence de novo, have found otherwise, Easttam v. Secretary of Health, Education, and Welfare, 364 F.2d 509 (8th Cir. 1966); Kerner v. Celebrezze, 340 F.2d 736 (2d Cir. 1965); Brown v. Celebrezze, 347 F.2d 227 (5th Cir. 1963); Reeves v. Gardner, 269 F. Supp. 635 (W.D.Ark.1967).

### Conclusion

Since there is substantial evidence to support the Secretary's decision that the plaintiff had failed to establish that he was disabled within the meaning of the Social Security Act (either as it read prior to its amendment on July 30, 1965, or as so amended) at any time on or before December 31, 1954, the last day on which he retained an insured status for disability purposes under the Social Security Act, the defendant's motion is sustained and a judgment will be entered affirming the decision of the Secretary of Health, Education, and Welfare denying the claim of the plaintiff.